K.C. PROPERTIES of N.W. ARKANSAS, INC. and
Buildings, Inc. *v.* LOWELL INVESTMENT PARTNERS, LLC;
Pinnacle Management Services, LLC; Tim Graham; Bill W.
Schwyhart; J.B. Hunt; Ozark Mountain Water Park, LLC; J.B.
Hunt, LLC; Schwyhart Holding, LLC; and Tim Graham, LLC

07-471 280 S.W.3d 1

Supreme Court of Arkansas
Opinion delivered March 13, 2008

[Rehearing denied April 17, 2008.]

*Cypert, Crouch, Clark & Harwell, PLLC*, by: *James E. Crouch*, for appellants.

*Kenneth R. Shemin*, for appellees.

JIM GUNTER, Justice. This appeal arises from an order of the Washington County Circuit Court granting a motion for summary judgment filed by Appellees Lowell Investment Partners, LLC (LIP); Pinnacle Management Services, LLC (PMS); Tim Graham (Graham); Bill W. Schwyhart (Schwyhart); J.B. Hunt (Hunt); Ozark Mountain Water Park, LLC (Ozark); J.B. Hunt, LLC (Hunt, LLC); Schwyhart Holding, LLC (Schwyhart, LLC); and Tim Graham, LLC (Graham, LLC). Appellants KC Properties (KC) and Buildings, Inc. (Buildings) appeal. We reverse the circuit court's order granting summary judgment and remand for further proceedings.

On August 5, 2004, KC and LIP entered into an operating agreement as members of Ozark. Pursuant to that operating agreement, LIP owned fifty-one percent of Ozark and KC owned forty-nine percent. PMS was named manager of Ozark. Ozark was created for the purpose of "operation of the water park at or near the intersection of Interstate 540 and Highway 264 in Lowell, Arkansas." The park was to occupy 16.58 acres of an approximately thirty-four acre tract of land at that site. The land was owned by Pinnacle Hills Realty (PHR), an LLC in which Schwyhart, LLC; Graham, LLC; and J.B. Hunt, LLC are members. Schwyhart, LLC; Graham, LLC; and J.B. Hunt, LLC are also the members of PMS. Schwyhart, Hunt, and Graham are the managers of PMS. The property was to be sold to Ozark for $3,000,000. That same day, Buildings entered into a contract with Ozark to construct the water park on the subject property on a cost-plus-six-percent basis.

On September 10, 2004, PHR entered into a real-estate contract with Parker Northwest Properties, LLC to sell the entire property located at the intersection of Interstate 540 and Highway 264. PHR sold the entire thirty-four acres for $8,250,000. KC filed suit against Appellees for breach of contract and breach of fiduciary duties in Washington County Circuit Court. KC contended that, because the subject property was to be sold to Ozark for $3,000,000, Ozark missed an opportunity to own property that was worth at least $1,023,088.25 more than what Ozark paid for it, and therefore, lost at least $501,313.24 in damages. Buildings sued for breach of contract contending that it lost a six-percent profit, which would have been $410,760. On January 23, 2007, the Washington County Circuit Court granted summary judgment in favor of Appellees on all counts. Appellants KC and Buildings now bring their appeal.

## I. Standard of review

Summary judgment is to be granted by a circuit court only when it is clear that there are no genuine issues of material fact to be litigated, and the party is entitled to judgment as a matter of law. *Bennett v. Spaight*, 372 Ark. 446, 277 S.W.3d 182 (2008) (citing *Wagner v. Gen. Motors Corp.*, 370 Ark. 268, 258 S.W.3d 749 (2007)). Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *See Bennett, supra* (citing *Pakay v. Davis*, 367 Ark. 421, 241

S.W.3d 257 (2006)). On appellate review, this court determines if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. *Id.* This court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Our review focuses not only on the pleadings, but also on the affidavits and other documents filed by the parties. *Id.*

## II. Points on appeal

### A. Ark. Code Ann. § 4-32-304

For their first point on appeal, Appellants argue that the circuit court erred in holding that Ark. Code Ann. § 4-32-304 (Repl. 2001) prohibits a member of a limited-liability company from suing a fellow member and manager for breach of contract and breach of fiduciary duty. Appellants specifically argue that the circuit court erred in holding that neither the members of Ozark nor its manager were proper parties to this lawsuit pursuant to § 4-32-304. Appellants contend that § 4-32-304 only applies to situations where a third party seeks to hold a member of an LLC liable for the debt, obligation, or liability of the LLC or another member thereof, but does not provide a shield for a member's or manager's own acts or omissions.

Appellees respond, arguing that the circuit court was correct in its holding. Specifically, Appellees assert that Appellants' claims against PMS must fail because the operating agreement states that the Manager shall not be held liable under a judgment, decree, or order of court for a debt, obligation, or liability of the company. Appellees contend that Appellants' claims against Graham, Schwyhart, Hunt, and their respective LLCs must fail because they were not parties to the operating agreement in their individual or corporate capacities. Appellees assert that, with respect to the breach-of-fiduciary-duty claims, the only members of Ozark were LIP and KC. Further, Appellees argue that Ark. Code Ann. § 4-32-304 eliminates breach of contract and tort liability for LIP, Graham, Schwyhart, Hunt, and Ozark.

This case presents an issue involving statutory interpretation. When reviewing issues of statutory interpretation, the first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Talbert v. U.S. Bank, N.A.*, 372

Ark. 148, 271 S.W.3d 486 (2008) (citing *Maddox v. City of Fort Smith*, 369 Ark. 143, 251 S.W.3d 281 (2007)). When the language of a statute is plain and unambiguous, there is no need to resort to rules of statutory construction. *Id.* A statute is ambiguous only where it is open to two or more constructions, or where it is of such obscure or doubtful meaning that reasonable minds might disagree or be uncertain as to its meaning. *Id.* When a statute is clear, however, it is given its plain meaning, and we will not reach for legislative intent; rather, that intent must be gathered from the plain meaning of the language used. *Id.* We are very hesitant to interpret a legislative act in a manner contrary to its express language, unless it is clear that a drafting error or omission has circumvented legislative intent. *Id.*

Arkansas Code Annotated § 4-32-304, which addresses the liability of members, provides:

Liability of Members to Third Parties .

Except for the personal liability for acts or omissions of those providing professional service as set forth in § 4-32-308, a person who is a member, manager, agent or employee of a limited liability company is not liable for a debt, obligation, or liability of limited liability company, whether arising in contract, tort, or otherwise or for the acts or omissions of any other member, manager, agent or employee of the limited liability company.

The Arkansas Small Business Entity Tax Through Act, Ark. Code Ann. § 4-32-402 (Repl. 2001), also addresses the liability of members, stating:

Unless otherwise provided in an operating agreement:

(1) A member or manager shall not be liable, responsible, or accountable in damages or otherwise to the limited liability company or to the members of the limited liability company for any action taken or failure to act on behalf of the limited liability company unless the act or omission constitutes gross negligence or willful misconduct;

While the plain language of § 4-32-304 seems to shield one member of a limited-liability company from being held liable to another member, the language of § 4-32-402 clearly allows

members to be held liable to other members of the limited-liability company when an act or omission constitutes gross negligence or willful misconduct. Statutes relating to the same subject are said to be in pari materia and should be read in a harmonious manner, if possible. *See Weiss v. Maples*, 369 Ark. 282, 253 S.W.3d 907 (2007). The title of § 4-32-304, "Liability of members to third parties," clarifies the intent of the legislature in enacting this statute and allows it to be read harmoniously with § 4-32-402. We have long held that the title of an act is not controlling in its construction, although it is considered in determining its meaning when such meaning is otherwise in doubt. *Baker Refrigeration Systems, Inc. v. Weiss*, 360 Ark. 388, 201 S.W.3d 900 (2005). The title may only be examined for the purpose of shedding light on the intent of the legislature. *Id.* Thus, when both the language of § 4-32-304 and its title are read together, it is clear that the legislature intended to prohibit suit *by a third party* against one member of a limited-liability company for another member's actions.

█ The circuit court ruled that, even if § 4-32-304 allowed members to sue other members, summary judgment was still proper because Graham, Schwyhart, Hunt, and their respective LLCs were not members. The operating agreement states that the agreement "is entered into and shall be effective as of August 5, 2004, by and among the Company, the Manager, *and all Persons who are identified* as *Members on Exhibit A attached hereto.*" Exhibit A attached to the agreement lists only LIP and KC as members. Therefore, according to the agreement, Hunt, Graham, Schwyhart, and their LLCs were not members of Ozark and § 4-32-304 does not apply to them.

█ Because LIP and KC were the only members of Ozark with PMS acting as manager, LIP and PMS were the only entities that KC could bring suit against under section § 4-32-402(1), set forth above, which provides that a member or manager, unless otherwise provided for by an operating agreement, can only be liable to the limited-liability company or members thereof if the act or failure to act constituted gross negligence or willful misconduct. However, LIP and PMS did not sell the property to another party. Rather, PHR, as owner of the property, sold the thirty-four acres to another party for $8,250,000. Thus, neither PMS nor LIP committed any act or failure to act constituting gross negligence or

willful misconduct for which they could be held liable under § 4-32-402(1). Accordingly, we affirm the circuit court's order of summary judgment on this point.

## B. Privity of contract

For their second point on appeal, Appellants argue that the circuit court erred in granting summary judgment based on its finding that Hunt, Graham, Schwyhart, and their LLCs were not in privity of contract with KC. Appellants assert that the circuit court erred in finding that there was no allegation made by Appellants that Hunt, Graham, Schwyhart, and their LLCs were agents of the manager, PMS. Appellants contend that the use of the term "manager" implies that there is an agency relationship and one should not have to actually use the term "agent" in order to imply that relationship. Appellees respond, arguing that the only entities that can potentially be held liable for a breach of contract in this situation are Ozark and perhaps its manager, PMS, because the contract to build the water park was between only Buildings and Ozark.

Appellants rely on § 4-32-301(b)(2) (Repl. 2001) for their proposition that the term "manager" implies that there is an agency relationship and that the term "agency" need not be used to allege an agency relationship. Section 4-32-301 states:

(a) Except as provided in subsection (b) of this section, every member is an agent of the limited liability company for the purpose of its business or affairs, and the act of any member, including, but not limited to, the execution in the name of the limited liability company of any instrument, for apparently carrying on in the usual way the business or affairs of the limited liability company of which he or she is a member, binds the limited liability company, unless the member so acting has, in fact, no authority to act for the limited liability company in the particular matter, and the person with whom the member is dealing has knowledge of the fact that the member has no such authority.

(b) If the articles of organization provide that management of the limited liability company is vested in a manager or mangers:

(1) No member solely by reason of being a member is an agent of the limited liability company; and

(2) *Every manager is an agent of the limited liability company* for the purpose of its business or affairs, and the act of any manager,

including, but not limited to, the execution in the name of the limited liability company of any instrument, for apparently carrying on in the usual way the business or affairs of the limited liability company of which he is a manager binds the limited liability company, unless the manager so acting has, in fact, no authority to act for the limited liability company in the particular matter, and the person with whom the manager is dealing has knowledge of the fact that the manager has no such authority.

*Id.* (emphasis added).

Appellants admit that there is no privity of contract between the individuals, their LLCs, and KC, but still seek to hold the individuals and their LLCs liable for breach of contract under the theory of agency. It is clear that the individuals and their LLCs were not parties to the operating agreement. "Pinnacle Management Services, LLC, Manager, by Bill W. Schwyhart, Manager" and "Pinnacle Management Services, LLC, Manager, by Tim Graham, Manager" signed the agreement for Ozark. "Pinnacle Management Services, LLC, Manager, by Bill W. Schwyhart, Manager" and "Pinnacle Management Services, LLC, Manager, by Tim Graham, Manager" signed for member LIP. Ken Bailey, President of KC, signed for member KC. "Bill W. Schwyhart, Manager" and "Tim Graham, Manager" signed for Manager PMS. Therefore, the LLCs were not parties to the operating agreement, and Schwyhart and Graham only signed as agents of PMS.

Appellants argue that PMS, through the individuals and their LLCs, caused PHR to sell the property intended for the water park and that these actions of PMS are imputed to LIP by and through their common membership and management. Pursuant to § 4-32-301(b)(2), PMS, as manager of Ozark, would also be considered an agent of Ozark. PMS is also the manager of LIP, and therefore, an agent of LIP. Schwyhart, Hunt, and Graham are managers of PMS, and pursuant to § 4-32-301, agents of PMS. The LLCs were acting in their capacity as members of PHR when they sold the property to another party and were not acting on behalf of either PMS or LIP. PHR had no fiduciary duty to Appellants. Further, Appellants provide us with no case law or authority for their proposition that the actions of one corporation can be imputed to another solely by their common membership and management. Because Appellants have failed to provide proof

rebutting the LLCs' proof that there was no breach of the operating agreement or a breach of fiduciary duties, we affirm summary judgment on this point.

### C. Consequential damages

For their third point on appeal, Appellants argue that the circuit court erred in holding that Buildings had no claim for breach of contract based upon a mutual waiver of consequential damages. Appellants specifically argue that the circuit court erred in equating lost profits with consequential damages. In response, Appellees assert that the circuit court was correct in its ruling because paragraph 13 of the contract provides for a mutual waiver of consequential damages.

Consequential damages are those damages that do not flow directly and immediately from the breach, but only from some of the consequences or results of the breach. *See Reynolds Health Care Servs., Inc. v. HMNH, Inc.*, 364 Ark. 168, 217 S.W.3d 797 (2005); *Bank of Am. N.A. v. C.D. Smith Motor Co.*, 353 Ark. 228, 106 S.W.3d 425 (2003); *Dawson v. Temps Plus, Inc.*, 337 Ark. 247, 987 S.W.2d 722 (1999). Lost profits are well recognized as a type of consequential damages. *See Reynolds, supra.* In order to recover consequential damages in a breach-of-contract case, a plaintiff must prove more than the defendant's mere knowledge that a breach of contract will entail special damages to the plaintiff. *Id.* It must also appear that the defendant at least tacitly agreed to assume responsibility. *Id.*

In the present case, paragraph 13 of the contract between Ozark and Buildings states:

> MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES
> Owner and Contractor agree to waive all claims against each other for any consequential damages that may arise out of or relate to this Agreement. Owner agrees to waive damages including but not limited to Owner's loss of use of the Project, any rental expenses incurred, loss of income, profit or financing related to the Project, as well as the loss of business, loss of financing, principal office overhead and expenses, loss of profits not related to this Project, or loss of reputation. *Contractor agrees to waive damages including but not limited to loss of business, loss of financing, principal office overhead and expenses, loss of profits not related to this Project, loss of bonding capacity or loss of reputation.* This Article shall not be construed to preclude contractual provisions for liquidated damages when such provisions

relate to direct damages only. The provisions of this Article shall also apply to the termination of this Agreement and shall survive such termination.

(Emphasis added.) The contract entered into between Buildings and Ozark provided that it was a cost-plus-six-percent contract. Buildings sued for six percent, or $410,760. This waiver specifically provided that Buildings agreed to waive "loss of profits not related to this Project." It is clear that the $410,760 in damages claimed by Buildings for breach of contract *are* related to the project, and therefore, not waived by the operating agreement. Further, the damages claimed by Buildings are not consequential damages because they flow directly from the breach of the construction contract. *See Reynolds, supra.* Thus, we hold that the circuit court erred in finding that Buildings waived its breach-of-contract claim.

■ Appellees argue that Buildings's breach-of-contract claim should be dismissed because it did not fulfill the condition precedent that requires the parties to attempt to settle any dispute through mediation before a lawsuit is filed. The contract between Ozark and Buildings states:

> 15.2 INITIAL DISPUTE RESOLUTION PROCESSES If a dispute arises out of or relates to this Agreement or its breach, the parties shall endeavor to settle the dispute first through direct discussions. If the dispute cannot be settled through direct discussions, the parties shall endeavor to settle the dispute by mediation under the current Construction Industry Mediation Rules of the American Arbitration Association before recourse to any binding dispute resolution procedures.

In their reply brief, Appellants argue that Appellees waived their right to enforce mediation. Appellants attached to their response to the motion for summary judgment two letters from their attorney to the Appellees' attorney requesting mediation, with one of the letters setting a deadline for the mediation. Appellants assert that Appellees never responded to the request for mediation and therefore waived the mediation requirement. The issue of whether Appellees waived the mediation requirement raises issues of fact, thereby making summary judgment inappropriate. Accordingly, we hold that the circuit court erred in granting summary judgment on Buildings's claim for breach of contract.

## D. Interference with contractual relationships

For their fourth point on appeal, Appellants argue that the circuit court erred in holding that there was not sufficient evidence to support Buildings's claim for interference with contractual relationships. Appellants assert that by selling the property where Buildings was to construct the water park, the individual appellees and their limited-liability companies interfered with Buildings's contract with Ozark making it impossible for it to construct the water park. In response, Appellees argue that the circuit court was correct in its ruling because Appellants failed to allege in their amended and restated complaint or otherwise state in the record exactly what constitutes the improper conduct of the individual appellees and their LLCs.

The elements of tortious interference that must be proved are: (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *See El Paso Prod. Co. v. Blanchard*, 371 Ark. 634, 269 S.W.3d 362 (2007) (citing *Stewart Title Guar. Co. v. Am. Abstract & Title Co.*, 363 Ark. 530, 215 S.W.3d 596 (2005)). Our law requires that the conduct of the defendants be at least "improper," and we look to factors in § 767 of the Restatement (Second) of Torts for guidance about what is improper. *See Dodson v. Allstate Ins. Co.*, 345 Ark. 430, 47 S.W.3d 866 (2001) (citing *Mason v. Wal-Mart Stores, Inc.*, 333 Ark. 3, 969 S.W.2d 160 (1998)). In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and the relations between the parties.

*Id.*

Here, Appellants assert that the following issues of fact should be considered by a jury in determining whether or not Appellees' actions were improper: (1) Appellees allowed Ozark to enter into a contract with Buildings to build a water park on the 16.58 acres when Schwyhart and Graham were in the process of negotiating for the sale of the exact same property to another buyer for another purpose; (2) that the Appellees breached fiduciary duties in the manner in which they went about selling the water park property; (3) that the individuals were attempting to promote their own interest and to profit for themselves; (4) that the Appellees sold the property in secret; (5) that the conduct interfering with the contract took place not only before but within a month after signing an agreement to build the water park on August 5, 2004; and (6) that the Appellees were not engaged in an arm's length transaction with Buildings.

The circuit court ruled that Appellants "failed to allege in their amended complaint or otherwise state in the record, exactly what constitutes the improper conduct of J.B. Hunt, individually, J.B. Hunt, LLC, Tim Graham, individually, Tim Graham, LLC, Bill Schwyhart, individually, and Schwyhart Holdings, LLC, that was improper within the definition of AMI 404." The circuit court further ruled that there was nothing in the record to support the allegations of wrongdoing, other than the fact that PHR sold the intended site of the water park to another buyer. We affirm the circuit court's ruling because Appellants did not provide specific facts or evidence to support their contention that these individuals and their LLCs engaged in improper conduct. For this reason, we affirm on this point.

### E. Restitution

For their fifth point on appeal, Appellants argue that the circuit court erred in finding that there was nothing in the record to support a claim for restitution and finding that there had been a waiver of this claim. They specifically assert that Buildings is entitled to restitution for expenses incurred prior to entering into the construction contract in anticipation of building the water park. In response, Appellees assert that the circuit court was

correct in its ruling because Buildings failed to identify any such damage and is therefore not entitled to proceed on this claim unless and until it specifies its damages.

Regarding the doctrine of restitution, we have stated:

> As an alternative to affirmance remedies, this court has allowed a defrauded party the remedy of restitution. This alternative remedy brings in the doctrine of election of remedies. Restitution is characterized as a disaffirmance remedy because it is awarded when the contract is revoked, rescinded, or disaffirmed. However, restitution differs from the two types of affirmance remedies just discussed. "Damages" refers to a money award compensating a plaintiff for losses. Dan B. Dobbs, *Law of Remedies*, § 1.1 (2d ed. 1993). Although an award of restitution may in fact provide compensation for the plaintiff in some cases, "[t]he restitutionary goal is to prevent unjust enrichment of the defendant by making him give up what he wrongfully obtained from the plaintiff." *Id.* Restitution is thus measured by the defendant's gain, not by the plaintiff's loss. *Id.*

*Smith v. Walt Bennett Ford, Inc.*, 314 Ark. 591, 602, 864 S.W.2d 817, 823 (1993).

Here, the circuit court noted that, excluding an action for recission, a party can only seek restitution in Arkansas if there is a contract implied in fact or implied in law. Relying on *Crosby v. Hardeman, Inc.*, 414 F.2d 1 (8th Cir. 1969), the circuit court found that there was nothing in the record to support a claim for restitution based upon a contract implied in fact because the parties entered into the operating agreement subsequent to the time that the expenses were incurred, and no provision was made by either party for the reimbursement of expenses prior to that date.

In *Crosby, supra*, the United States Eighth Circuit Court of Appeals stated:

> An implied in fact contract may be inferred from the facts and circumstances of a given case, but an indispensable element of any contract, express or implied, is a promise.
>
> . . . .
>
> In 1 Williston, *Contracts* § 3 (3d ed. 1957) contracts implied in fact are treated as true contracts arising from mutual agreements and

intents to promise where the agreement and promise have not been expressed in words and it is noted at page 11, "The elements requisite for an informal contract, however, are identical whether they are expressly stated or implied in fact." The difference between an expressed contract containing an actual promise and an implied contract where the contract is implied from the conduct of the parties is merely in the mode of manifesting assent and in the mode of proof. Both express and implied contracts are founded upon mutual assent of the parties and require a meeting of the minds. 17 C.J.S. *Contracts* § 3 at pp. 553-554 (1963).

*Id.* at 7. We have held that a contract implied in fact derives from the "presumed" intention of the parties as indicated by their conduct. *Steed v. Busby*, 268 Ark. 1, 593 S.W.2d 34 (1980) (citing *Caldwell v. Mo. State Life Ins. Co.*, 148 Ark. 474, 230 S.W. 566 (1921)). An implied contract is proven by circumstances showing the parties intended to contract by circumstances showing the general course of dealing between the parties. *Id.*

■ In the present case, Buildings produced an affidavit from Ken Bailey setting forth a demand for restitution in the amount of $52,645.59 that it had advanced to the water park. Bailey's affidavit states that Buildings spent $102,645.59 in expenses toward the water park project, but gave Appellees a credit for $50,000. Buildings wanted to be reimbursed for the $52,645.59 as well as $126,305 for a claim made by Professional Parks against Buildings related to the water park. Buildings claimed that these expenses were expended on the water park and the design of the water park incurred during the year 2003 through July of 2004.

The operating agreement was not executed until August 5, 2004, after Buildings incurred these expenses on the water park. There was no provision made by either party for reimbursement of expenses prior to that date. A promise to pay is an indispensable element of a contract, whether express or implied. *See Crosby*, *supra.* Therefore, there is nothing in the record to support a claim for restitution based on a contract implied in fact.

■ Alternatively, the circuit court found that a contract implied in law was only proper where the defendant benefited unjustly, and the law implied a contract to repay. In the present case, there has not been any unjust enrichment on the part of Schwyhart, Hunt, Graham, or their LLCs, which would entitle Buildings to restitution. Despite the fact that Buildings expended

funds in anticipation of constructing the water park, none of the individuals or their LLCs have wrongfully obtained anything from Buildings. *See Smith, supra.* Therefore, we affirm the circuit court's grant of summary judgment on Appellants' restitution claim.

### F. Promissory estoppel

For their sixth point on appeal, Appellants argue that the circuit court erred in finding that the defenses of waiver and estoppel barred the promissory-estoppel claim of KC and Buildings and that there were no facts to support a claim of promissory estoppel. Specifically, Appellants contend that individual defendants Graham and Schwyhart, whose companies have the same principals in both PHR and PMS, as well as principals in LP, made certain promises and representations to Appellants that the subject property was to be sold to them. Appellants assert that, in reliance on these promises, KC discontinued any attempt to find property for its water park and expended monies in anticipation of going forward with the project. In response, Appellees assert that the circuit court was correct in rejecting Appellants' claim for promissory estoppel because there is no evidence in the record that the individuals or their respective LLCs ever made any promises to Appellants to sell the subject property to Ozark beyond what is stated in the operating agreement.

The black-letter law on promissory estoppel is found in the Restatement (Second) of Contracts:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*See Rigsby v. Rigsby,* 356 Ark. 311, 149 S.W.3d 318 (2004). We have held that the party asserting estoppel must prove it strictly, there must be certainty to every intent, the facts constituting it must not be taken by argument or inference, and nothing can be supplied by intendment. *Ward v. Worthen Bank & Trust Co.,* 284 Ark. 355, 681 S.W.2d 365 (1985) (citing *Julian Martin, Inc. v. Ind. Refrigeration Lines, Inc.,* 262 Ark. 671, 560 S.W.2d 228 (1978)). Further, we have stated that a party asserting estoppel must prove that in good faith he relied on some act or failure to act by the other party and, in reliance on that act, suffered some detriment. *Peek v. Simmons First Nat'l Bank,* 309 Ark.

294, 832 S.W.2d 458 (1992) (citing *Worth v. Civil Serv. Comm'n*, 294 Ark. 643, 646, 746 S.W.2d 364, 366 (1988)). Whether there was actual reliance and whether it was reasonable is a question for the trier of fact. *See Rigsby, supra.*

In the present case, following the filing of Appellees' motion for summary judgment, Ken Bailey, President of KC, submitted an affidavit, which states:

> We were told by Graham, Schwyhart and Hunt that they own the property under another company, Pinnacle Hills Realty, and they verbally agreed and verbally promised that they would sell it for $3,000,000.00 to the company we were going to form to own the Water Park.
>
> . . . .
>
> Although we knew there was potentially other land where this water park might be located, after we made the deal with Hunt, Graham and Schwyhart, we discontinued looking for other properties and in particular we gave up looking at the 20 acres on Wagon Wheel Road which we could have purchased for $1,100,000.00. Had we not had the promises from Graham, Schwyhart and Hunt, we would have continued our search for property at other locations. The Manager of the Ozark Mountain Water Park, Pinnacle Management Services, sold the water park property without finding suitable replacement property. However, now that the water park property is not available there is no other viable, affordable property that exists along I-540.

This self-serving affidavit is the only evidence presented by Appellants that would support their claim for promissory estoppel. The circuit court found that there was no foundation in Bailey's affidavit that he was a real estate agent or otherwise qualified to assert his opinion with respect to the availability of affordable property along I-540 for sale. Because our case law states that the facts constituting promissory estoppel must not be taken by argument or inference, and nothing can be supplied by intendment, *see Ward, supra,* we hold that Appellants have failed to rebut proof with proof concerning the claim for promissory estoppel and affirm summary judgment on this point.

### G. *Piercing the corporate veil*

For their seventh point on appeal, Appellants argue that the circuit court erred in finding that there was absolutely no evidence

to support KC and Buildings's claim that the corporate veil of the limited-liability companies should be pierced. Appellants specifically assert that piercing the corporate veil of these limited-liability companies presents issues of fact which preclude summary judgment. They further contend that, by piercing the corporate veil, the individuals, as managers of PMS, and the LLCs, as members of PMS, may be held liable for the actions of PMS and LIP. In response, Appellees assert that there is no evidence to support Appellant's claim for piercing the corporate veil.

It is a nearly universal rule that a corporation and its stockholders are separate and distinct entities, even though a stockholder may own the majority of the stock. *Anderson v. Stewart*, 366 Ark. 203, 234 S.W.3d 295 (2006); *First Commercial Bank v. Walker*, 333 Ark. 100, 969 S.W.2d 146 (1998). In special circumstances, the court will disregard the corporate facade when the corporate form has been illegally abused to the injury of a third party. *EnviroClean, Inc. v. Ark. Pollution Control & Ecology Comm'n*, 314 Ark. 98, 858 S.W.2d 116 (1993); *Don G. Parker, Inc. v. Point Ferry, Inc.*, 249 Ark. 764, 461 S.W.2d 587 (1971). The conditions under which the corporate entity may be disregarded or looked upon as the alter ego of the principal stockholder vary according to the circumstances of each case. *Anderson, supra* (citing *Winchel v. Craig*, 55 Ark. App. 373, 934 S.W.2d 946 (1996)). The doctrine of piercing the corporate veil is founded in equity and is applied when the facts warrant its application to prevent an injustice. *Humphries v. Bray*, 271 Ark. 962, 611 S.W.2d 791 (Ark. App. 1981). Piercing the fiction of a corporate entity should be applied with great caution. *Banks v. Jones*, 239 Ark. 396, 390 S.W.2d 108 (1965); *Thomsen Family Trust v. Peterson Family Enters.*, 66 Ark. App. 294, 989 S.W.2d 934 (1999). The issue of whether the corporate entity has been fraudulently abused is a question for the trier of fact, and the one seeking to pierce the corporate veil and disregard the corporate entity has the burden of proving that the corporate form was abused to his injury. *See Nat'l Bank of Commerce v. HCA Health Servs. of Midwest, Inc.*, 304 Ark. 55, 800 S.W.2d 694 (1990).

All corporations, regardless of the fact that the holders of stock and the officers of the corporation are identical, are separate and distinct legal entities; and it follows that, in the absence of facts on which liability can be predicated, one such corporation is not liable for the debts of another. *See Mannon v. R.A. Young & Sons Coal Co.*, 207 Ark. 98, 179 S.W.2d 457 (1944). "The fact that the

officers of one corporation are also officers of another does not make the corporations the same, nor the acts of one the acts of the other." *Id.* (citing 19 C.J.S. *Corporations* § 789, at 166). "The fact that some of the stockholders in one company had also stock in each of the other companies, and the fact that the general managers and officers of one company were also general managers and officers of another company, did not make these companies the same corporation, nor the acts of one the acts of the other." *Id.* (citing *Fort Smith Light & Traction Co. v. Kelley*, 94 Ark. 461, 127 S.W. 975 (1910)).

 Appellants argue that Appellees' response to interrogatories and requests for production of documents support Appellants' allegations that the corporate veil should be pierced. In their response to interrogatories, Appellees admit that (1) LIP technically has no members; (2) LIP has no operating agreement, books, or records; (3) LIP has no assets and that PHR paid for all of its bills; (4) that there are no contributions to capital made by any members of LIP or Pinnacle; and (5) there were no loans made by any member. However, based on our case law, PMS, LIP, and the individual LLCs are separate and distinct legal entities regardless of whether they include the same people. *See Mannon, supra.* Further, there have been no facts presented by Appellants upon which the individual LLCs can be held liable for the actions of PMS and LIP. Therefore, we affirm the circuit court's grant of summary judgment on this point. Accordingly, because we hold that the circuit court erred in granting summary judgment on Buildings's claim for breach of contract, we reverse and remand for further proceedings.

Reversed and remanded.

HANNAH, C.J., concurs.

BROWN and IMBER, JJ., not participating.

JIM HANNAH, Chief Justice, concurring. I concur in the majority's decision in this case; however, I write separately because I am concerned about confusion that may arise from this opinion due to the manner in which the parties in this case pled, tried, and presented the issue of consequential damages to both the circuit court and to this court on appeal. With few exceptions, such as subject-matter jurisdiction, this court does not raise an issue on its own motion. *See, e.g., State v. Boyette*, 362 Ark. 27, 207 S.W.3d 488

(2005). The contract issue that concerns me is not an issue that we would typically raise on our own motion; however, for the sake of clarity in explaining why this case was decided as it was, I wish to bring my concerns to the attention of those who will read this opinion.

What I wish to discuss is that the issue on equating lost profits with consequential damages presumes a valid contract between the parties when that issue was not decided below. The circuit court was presented with the argument that even if there was a valid contract, any consequential damages were waived under the contract terms, making the issue moot. The circuit court decided the issue on this basis. However, by pleading this case and trying it as the parties have, the remand on consequential damages now assumes that there is a valid contract. This arguably circumvents that decision in the circuit court entirely. The argument made below regarding the clause on consequential damages raises the question of whether the issue of a valid contract was waived. "Waiver means the intentional relinquishment of a known right." *Thompson v. Bank of Am.*, 356 Ark. 576, 583, 157 S.W.3d 174, 178 (2004). I am not convinced that waiver is shown on the facts that have been presented on appeal. To the contrary, the facts show that Buildings was concerned about whether it even had a contract claim, as shown by its argument below that its claims be considered as tort claims.

I am not convinced that there was a valid contract. Buildings asserted in its breach-of-contract claim that Ozark breached its "duty" to "perform" and its "duty of acting with good faith" when it failed to secure title to a specific seventeen-acre piece of property so that Buildings could perform and obtain the benefit of its contract. The Standard Short Form Agreement Between Owner and Contractor is the contract between Buildings and Ozark. It contains no contractual obligation that Ozark provide a specific site for construction. Exhibit A to the Agreement is a Project Construction Summary. It includes a cost of $3,000,000 for "purchase of 17 acres of land." There is no reference in the Agreement or the Summary to what seventeen acres are to be bought or that any specific piece of property must be purchased. The Summary does not place the obligation of acquiring the seventeen acres on any specific party; however, given Buildings has sued Ozark for its failure to secure title to the acreage at issue in this case, we can assume that, at least in Buildings's opinion, it was not Buildings's contractual obligation to secure title. Clearly,

the Summary is not simply a description of Buildings's obligations under the contract. Instead, it must memorialize the consensus of the parties to the project on what the costs would be. I see nothing in the Agreement or Summary that obligated Ozark to provide this specific acreage for this project, and I see nothing in the Agreement, Summary, or record in this case, that would stop the parties from fulfilling the contractual obligation on some other acreage. Perhaps there was a breach of the implied covenant of good faith and fair dealing in this case, but the breach–of–contract claim in the complaint is based on a failure to acquire a specific piece of property, and the contract does not appear to create this obligation.

My concern was considered to some degree by the parties below, but the issue was not developed or decided. The circuit court in its order on the summary judgment stated the following: "In order to avoid Defendants' privity argument, Plaintiff Buildings, Inc. argues in its Brief in Response to Motion for Summary Judgment that the breach of contract claim by Buildings, Inc., should be treated as a tort." The circuit court then found that even assuming there were such an obligation, there was a mutual waiver of consequential damages in the contract that moots the issue. The issue is no longer moot because this court is sending the case back on the point of consequential damages. The issue of the existence of a contract should be litigated.