2010 Ark. 73

**Jeffrey BARROWS, Appellant,**

**v.**

**CITY OF FORT SMITH, Arkansas, and Kevin Lindsey, Chief of Police, in his Official Capacity, Appellees.**

**No. 09–756.**

Supreme Court of Arkansas.

Feb. 18, 2010.

118 ██ 

Gilker and Jones, P.A., by: Michael R. Jones, Mountainburg, for appellant.

Daily & Woods, P.L.L.C., by: Wyman R. Wade, Jr. and L. Matthew Davis, Fort Smith, for appellees.

DONALD L. CORBIN, Justice.

Appellant Jeffrey Barrows appeals orders of the Sebastian County Circuit Court entered in favor of Appellees the City of Fort Smith and Kevin Lindsey, the City's chief of police (collectively referred to as the "City"). On appeal, Barrows argues that (1) the circuit court erred in determining that it must, as a matter of law, dismiss his claim under the Arkansas Whistle–Blower Act because of the dismissal of his civil-service appeal; (2) there were genuine issues of material fact to be resolved with regard to his whistle-blower claim; and (3) the circuit court erred in holding that his termination was warranted after finding Barrows violated certain rules and policies of the Fort Smith Police Department. Our jurisdiction of this appeal is pursuant to Ark.Code Ann. § 4–51–308(e)(2)(A) (Supp.2009), governing suspension, discharge, or reduction in rank for certain civil-service officers. We reverse and dismiss Barrows's civil-service appeal and affirm the circuit court's order granting summary judgment on Barrows's claim under the Whistle–Blower Act.

Barrows was employed as an officer with the Fort Smith Police Department in June 1992. He rose from the rank of patrolman to the rank of major until his termination on October 17, 2007. For approximately six months, Barrows served as the interim chief of police until Appellee Kevin Lindsey was hired as police chief in January 2007. At the time of his termination, Barrows was in charge of the department's Administrative Services division.

As chief, Lindsey wished to implement new programs that led to some disputes with Barrows. According to Barrows, Chief Lindsey instituted these programs and initiatives without first seeking the advice or input of the staff responsible for their execution. Barrows further claimed that these programs created problems because they were inconsistent with the department's existing policies, were possibly wasteful of public funds, and potentially contravened state laws. Specifically, Barrows was concerned with the implementation of a Sentinel program, a type of citizen-policing program. According to Barrows, he met with Chief Lindsey on July 13, 2007, to express concerns about the Sentinel program and to tell him that he felt compelled to voice his concerns to the chief's direct supervisor, Randy Reed, Fort Smith City Administrator. Thereafter, Chief Lindsey and Administrator Reed met to discuss the concerns raised by Barrows.

Chief Lindsey then held a meeting with Barrows and two other top administrators, Major Steve Howard and Major Ricky Brooks. According to Barrows, the chief apologized for not keeping his administrators better informed and asked each of them whether or not they had confidence in his ability to perform his job. Barrows and Reed stated that they did not, and this information soon began circulating through the department.

On August 23, 2007, Chief Lindsey filed a complaint with Captain Alan Haney of the Office of Professional Standards, alleging a series of violations on Barrows's part

that necessitated that Barrows be immediately relieved from duty. Included in the complaint were alleged violations for failing to observe and adhere to department policies, showing disrespect towards supervisory officers, engaging in conduct unbecoming an officer, and publicly criticizing and ridiculing the department. That same day, Captain Haney notified Barrows in writing that an internal complaint had been filed against him alleging major violations of the department's rules and policies. Captain Haney instituted an investigation into the complaint, interviewing Barrows, other department employees, and certain city administrators. At the conclusion of his investigation, Captain Haney determined that there might have been violations of several departmental rules and regulations by Barrows.

A review panel, consisting of Major Brooks and Major Dean Pitts, was empaneled to review the investigative file put together by Captain Haney. This panel determined that Barrows should be offered the opportunity to explain his actions in a predetermination hearing, but Barrows, through counsel, declined to participate in such a hearing. The review panel then determined that Barrows had violated departmental rules and policies and that discipline was warranted, specifically, termination. The matter was then returned to Chief Lindsey who agreed that the appropriate discipline was termination.

As a result of his termination, Barrows made a timely written request before the City's Civil Service Commission. A hearing before the Commission was held on November 30 to December 1, 2007. At the conclusion of the trial, the Commission found that there were sufficient facts to determine that there was just cause for Chief Lindsey's conclusion that Barrows violated rules and policies of the department. The Commission then determined by a unanimous vote that the termination of Barrows's employment was the appropriate disciplinary action. Barrows filed a timely notice of appeal with the Commission. In turn, the Commission prepared a written order and record.

Prior to the Commission entering its written order, Barrows filed an action in federal district court alleging that he was terminated without cause, and that such termination violated his constitutional rights to due process and to petition the government for redress, as well as alleging a cause of action under the Arkansas Whistle–Blower Act, codified at Ark.Code Ann. §§ 21–1–601 to –609 (Repl.2004 & Supp.2007). The district court dismissed with prejudice Barrow's federal due-process claim after ruling that he was afforded due process. *Barrows v. City of Ft. Smith, Ark.,* No. 08–2002, 2008 WL 2026088 (W.D.Ark. May 9, 2008). Likewise, the district court dismissed his First and Fourteenth Amendment claims that he was retaliated against for exercising his right to petition the government for redress of his grievances. The district court then determined that it could not exercise pendent jurisdiction over Barrows's state claims and thus dismissed them without prejudice.

After the dismissals in district court, Barrows filed a complaint in circuit court seeking appellate review of the Commission's order upholding his termination and asserting a cause of action under the Whistle–Blower Act. The City moved for a dismissal of Barrows's complaint, arguing that the circuit court lacked jurisdiction because Barrows failed to comply with the requirements for filing an appeal from a decision of the Commission, as set forth in section 14–51–308. The circuit court denied the motion to dismiss after determining that Barrows was entitled to the protection of the savings statute, codified at

Ark.Code Ann. § 16–56–126 (Repl.2005). After reviewing the record of the proceedings before the Commission, the circuit court entered an order finding that Barrows had violated numerous rules and policies of the Fort Smith Police Department and that termination was therefore the appropriate discipline. Thereafter, the City filed a motion for summary judgment, arguing that because the court had found that Barrows was terminated as a result of his violations of departmental rules and policies, the City had an affirmative defense to Barrows's claim under the Whistle–Blower Act. The circuit court subsequently entered an order granting the City's motion for summary judgment on the whistle-blower claim. This appeal followed.

■ As a threshold issue, this court must determine whether we have jurisdiction of Barrows's civil-service appeal. Although it is an issue not raised by any of the parties, it is axiomatic that this court will raise issues of subject-matter jurisdiction sua sponte. *Hernandez v. Hernandez,* 371 Ark. 323, 265 S.W.3d 746 (2007).

■ This court addressed a jurisdictional issue in an appeal from a civil-service decision in *Clark v. Pine Bluff Civil Service Commission,* 353 Ark. 810, 120 S.W.3d 541 (2003). There, this ⌊₆court noted that the United States Supreme Court has explained that a right to appeal is not based on the federal constitution, and that " '[i]t is wholly within the discretion of the State to allow or not to allow such a review.' " *Id.* at 812, 120 S.W.3d at 543 (quoting *McKane v. Durston,* 153 U.S. 684, 687, 14 S.Ct. 913, 38 L.Ed. 867 (1894)). Moreover, once a state decides to confer a right of appeal, it may do so "upon such terms as in its wisdom may be deemed proper." *Id.* (quoting *Evitts v. Lucey,* 469 U.S. 387, 409, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985)). Thus, this court acknowledged that we look to our state constitution or statutes to find a right to appeal. *Id.; see also State v. Mills,* 311 Ark. 363, 844 S.W.2d 324 (1992) (noting that generally appeals are granted as a matter of statute).

The right to appeal from a Civil Service Commission decision, and the procedure for effectuating that appeal, is found in section 14–51–308, which provides in relevant part:

(e) (1)(A) A right of appeal by the city or employee is given from any decision of the commission to the circuit court within the jurisdiction of which the commission is situated.

(B) (i) The appeal shall be taken by filing with the commission, within thirty (30) days from the date of the decision, a notice of appeal. The responsibility of filing an appeal and paying for the transcript of the proceedings before the municipal civil service commission shall be borne by the party desiring to appeal the commission's decision.

(ii) The commission will upon receiving notice of an appeal prepare a written order containing its decision and ensure that the transcript and evidence be made available for filing in the circuit court once the appealing party has paid the cost of preparing the transcript.

(iii) However, if the court determines that the party appealing the commission's decision took the appeal in good faith and with reasonable cause to believe he or she would prevail, the commission shall reimburse the appealing party for the cost of the transcript.

⌊₇(C) (i) The court shall review the commission's decision on the record and may, in addition, hear testimony or allow the introduction of any further evidence upon the request of either the city or the employee.

(ii) The testimony or evidence must be competent and otherwise admissible.

(2) (A) A right of appeal is also given from any action from the circuit court to the Arkansas Supreme Court.

(B) The appeal shall be governed by the rules of procedure provided by law for appeals from the circuit court to the Arkansas Supreme Court.

Ark.Code Ann. § 14–51–308(e).

According to this court in *Clark*, in order to initiate an appeal under this statute a party has thirty days from the date of the Commission's decision in which to file a notice of appeal with the Commission. Ark.Code. Ann. § 14–51–308(e)(1)(B)(i). Although section 14–51–308(e)(2)(B) specifies that an appeal from circuit court to our court is to follow the appellate rules of procedure, the statute does not specify the rules of procedure to be followed to perfect an appeal to the circuit court after the Commission has issued a written decision and prepared the transcript.

■ In addressing the statute's silence on this issue, our court stated as follows:

We have a constitutional mandate to prescribe the rules of procedure governing the courts of this state. Ark. Const. amend. 80, § 3. Even prior to the effective date of Amendment 80, we held that where a conflict existed between our rules and statutory provisions, our rules would remain supreme. The statute at issue here is silent on the procedure to be followed in perfecting an appeal from the commission to the circuit court. Inferior Court Rule 9 governs the procedure for an appeal from inferior court to circuit court. Rule 9 has been used to govern the procedure for appeals from municipal and county boards and commissions. Therefore, we hold that once the requirements of Ark.Code Ann. § 14–51–308(e)(1)(B) have been met, an appeal from ∤₈a decision of the civil service commission to circuit court should proceed in accordance with the rules of this court governing an appeal from inferior courts.

*Id.* at 814–15, 120 S.W.3d at 544–45 (citations omitted). Thus, according to our decision in *Clark*, a party appealing a decision of the civil service commission has, pursuant to Rule 9(c), thirty days from the entry of the Commission's written decision to file a record with the circuit court.[1]

■ Moreover, failure to strictly comply with Rule 9 requires dismissal of the case. *Id.* Where an appeal falls under Rule 9, compliance with its requirements is mandatory and jurisdictional, and failure to comply precludes the circuit court from exercising jurisdiction over the appeal. *Id.; Douglas v. City of Cabot*, 347 Ark. 1, 59 S.W.3d 430 (2001). If the trial court lacked subject-matter jurisdiction, we also lack subject-matter jurisdiction. *Clark*, 353 Ark. 810, 120 S.W.3d 541; *Vanderpool v. Fidelity & Cas. Ins. Co.*, 327 Ark. 407, 939 S.W.2d 280 (1997).

■ Here, it is undisputed that Barrows failed to follow the procedure set forth in section 14–51–308 or to comply with the requirements of Rule 9. Instead of filing a timely appeal in circuit court, Barrows opted to proceed with an action in federal court. His ultimate state court action was filed on May 23, 2008, months after the

---

1. Rule 9 was amended in 2008 and now includes subpart (f), which governs administrative appeals where there is no statute that addresses how a party may take an appeal or how the record shall be prepared. Those procedures are established in section 14–51–308(e), and nothing in amended Rule 9(f) conflicts with our holding in *Clark* that an appellant must perfect an appeal to circuit court within thirty days of the Commission's written decision.

Commission prepared its written order on January 16, 2008. Based on a plain reading of the statute, our court rules, and this court's decision in *Clark*, Barrow's failure to comply with the statutory requirements for appealing the Commission's decision to the circuit court in a timely manner subsequently deprived the circuit court of jurisdiction over the civil-service appeal.

We are cognizant of the fact that the circuit court rejected the City's motion to dismiss the civil-service appeal, but the circuit court's finding that Barrows was entitled to avail himself of the savings statute was erroneous. In arguing that the savings statute applied to his case, Barrows cited the circuit court to this court's decision in *Sosebee v. County Line School District*, 320 Ark. 412, 897 S.W.2d 556 (1995). This case, however, is wholly inapplicable.

In *Sosebee*, the appellant, a teacher, appealed a circuit court decision determining that her appeal under the Teacher Fair Dismissal Act was a special proceeding and, thus, prevented her from refiling her appeal following her voluntary nonsuit of that appeal. In reversing the circuit court, this court concluded that the appellant's appeal was not a special proceeding and was subject to the rules of civil procedure, thus, allowing the teacher to refile her action within the one-year time limit set forth by the savings statute, section 16–56–126. *Sosebee* is clearly distinguishable. First, it was a case under the Teacher Fair Dismissal Act, not an appeal from a decision of the Civil Service Commission such as here. Second, and most important, the appellant in *Sosebee* complied with the statutory requirements for filing her appeal, i.e., she timely filed that appeal in circuit court and only then took a voluntary nonsuit. Here, however, Barrows never complied with the statutory require-

ments for timely filing an appeal in circuit court. Accordingly, Barrows could not avail himself of section 16–56–126, and his appeal to circuit court was therefore untimely. Because it was untimely, the circuit court lacked jurisdiction over the appeal, as does this court. We thus reverse and dismiss Barrows's civil-service appeal.

We now turn to Barrows's claim under the Whistle–Blower Act. As his first point on appeal, Barrows argues that the circuit court erred in holding that its dismissal of his civil-service appeal was binding on and required dismissal of his claim under the Whistle–Blower Act. Barrows asserts that there is no requirement for a jury to return a verdict that is consistent with the circuit court's findings in the civil-service appeal and, by granting summary judgment on the whistle-blower claim, the circuit court deprived him of his constitutional right to a trial by jury. Interrelated with this point is Barrows's second point on appeal, which is that summary judgment on the merits would have been inappropriate because there remained issues of material fact to be decided.

The City argues that Barrows's first point misstates the circuit court's finding and presumes that Barrows submitted sufficient evidence to get his case to a jury, which according to the City, he did not. Specifically, the City contends that the circuit court determined that its asserted affirmative defense to Barrows's whistle-blower claim was meritorious and, as a result, there were no genuine issues of fact left to be determined, warranting the grant of summary judgment. The City is correct.

Before turning to the merits of this appeal, we note that summary judgment may only be granted when there are no genuine issues of material fact to be litigated, and the moving party is entitled

to judgment as a matter of law. *K.C. Props. of Nw. Ark., Inc. v. Lowell Inv. Partners, LLC,* 373 Ark. 14, 280 S.W.3d 1 (2008). Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* On appellate review, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. *Id.* This court views the evidence in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Our review focuses not only on the pleadings, but also on the affidavits and other documents filed by the parties. *Id.*

Pursuant to the Arkansas Whistle–Blower Act, a public employee who reports violations of law or waste of public funds to the appropriate authorities is afforded protection under the Act. *See* Ark. Code Ann. § 21–1–602(8). A public employer shall not take any adverse action against a public employee for a communication that falls within the protection of this subchapter. *See* Ark.Code Ann. § 21–1–603(a)(1). Pursuant to section 21–1–602(1), an "adverse action" means to discharge, threaten, or otherwise discriminate or retaliate against a public employee in any manner that affects the employee's employment, including compensation. A whistle-blower who is punished by a public employer may seek actual damages and injunctive relief. *See* Ark.Code Ann. § 21–1–604(a). However, "[a] public employer shall have an affirmative defense to a civil action brought by a public employee under this subchapter if the adverse action

taken against a public employee was due to employee misconduct [or] poor job performance . . . unrelated to a communication made pursuant to § 21–1–603." *See* Ark.Code Ann. § 21–1–604(e)(1). In order for Barrows to prevail on his claim under the Act, he was required to establish, by a preponderance of the evidence, that he suffered an adverse action because he engaged or intended to engage in an activity protected under the Act and that such action was unrelated to his own misconduct or poor job performance.

In this case, Barrows asserted that his employment was terminated as a result of his reporting concerns regarding Chief Lindsey's job performance to Lindsey's supervisor, Administrator Reed. The City, in seeking summary judgment, argued that the circuit court's prior determination that Barrows's termination was the result of his violating departmental rules and procedures created an affirmative defense to Barrows's whistle-blower claim. In other words, the City argued that Barrows's termination was in no way related to any communication between him and Administrator Reed and, as such, his claim under the Whistle–Blower Act was without merit. Thus, the question to be answered in this case is whether there are material facts in dispute as to Barrows's whistle-blower claim that create an issue to be tried by a jury.

The record reflects that Barrows was charged with numerous violations of departmental rules and policies, of which the circuit court found the most serious allegations to be those related to Barrows's actions that served to undermine the authority of Chief Lindsey and to interfere with the administration of the police department.[2] In reviewing Barrows's own testi-

---

**2.** The circuit court also found that Barrows violated certain rules and policies in connec- tion with his performance of personal tasks on departmental time and asking subor-

mony before the Commission, as well as the testimony of other employees, it is clear that those allegations were well-founded.

Captain Haney, the investigating officer, testified that he discussed the allegations of undermining the chief with Barrows and that Barrows stated that he had discussed "competency issues" with "most everyone" in Administrative Services. Moreover, Captain Haney said that Sergeant Jarrard Copeland, Captain Mark Hallum, and Crystal Davis, all employees who worked under Barrows in Administrative Services, reported to Captain Haney that Barrows had discussed with each of them competency issues regarding Chief Lindsey. Barrows also admitted to Captain Haney that he had discussed competency issues with people outside the department, including Administrator Reed.

Sergeant Copeland testified that he is the public affairs officer for the Fort Smith Police Department. According to Copeland, sometime in July of 2007, Barrows called him in for a meeting and told Copeland that he had serious problems with Chief Lindsey. According to Copeland, Barrows stated that Chief Lindsey was bringing down the department. Barrows then instructed that in the future, Copeland should bring to Barrows, instead of Chief Lindsey, any newsworthy events Copeland intended to take to the media. Copeland further stated that Barrows told him that Chief Lindsey was "not competent, he was not a manager of people, he did not have the ability to run this department, and, therefore, when you have something of a major concern, bring it to me instead of him."

Major Ricky Brooks testified that he was one of the department heads called into a meeting with Barrows and Chief Lindsey on July 16, 2007. According to Brooks, when asked by Lindsey whether he had confidence in his ability to be chief, Barrows accused the chief of lying and stated that he was tired of the lies and had no confidence in Chief Lindsey. Major Brooks also testified that he was part of an ad hoc committee required to review Captain Haney's investigation of Barrows and that after reviewing the written materials and tapes of Captain Haney's interviews, he concluded that it was possible that there were violations of department rules, regulations, and policies that merited a predetermination hearing. In discussing the rules he believed Barrows to have violated, Major Brooks pointed out that Barrows had gone to other officers and told them to report to him (Barrows) instead of the chief. According to Major Brooks, it appeared to people in the department that there was a power struggle between Barrows and Chief Lindsey that impaired the operation of the department.

Corporal Mikeal Bates testified that he had a discussion with Barrows in which Barrows stated that he was frustrated and that he did not believe Chief Lindsey knew what he was doing and that he felt other divisions were falling apart. Bates stated that he did not know why Barrows was sharing this information with him but that he was not surprised by Barrows's comments because his feelings were "pretty common knowledge throughout the department."

Captain Mark Hallum testified that he had a conversation with Barrows on July 16, 2007, wherein Barrows told Hallum that there had been some things going on between himself and Chief Lindsey. Ac-

dinates to assist him with personal matters. Because the violations related to Barrows's conduct toward Chief Lindsey sufficiently

demonstrate that his termination was justified, it is not necessary to go into these other violations.

cording to Hallum, he was told the two men had some type of encounter where Barrows told the chief he did not have confidence in him and that he needed to resign before Administrator Reed fired him.

Detective Mike McCoy, who is also president of the Municipal Police Association, testified that he reported to Captain Haney about a meeting he had with Barrows in July 2007 regarding the Association's attempt to obtain officers' benefits for the coming year. According to McCoy, he first met with Chief Lindsey who gave him some suggestions regarding how to proceed at an upcoming City board meeting. McCoy next met with Barrows who told him that McCoy was "pissing off" Barrows's wife, Velvet Barrows, a City director, and Administrator Reed and that if there was a "blue flu" or if officers decided to stop writing tickets, McCoy was "going to have hell to pay." Barrows also told McCoy it was not his place to go to the board meeting but rather it was up to Administrator Reed. According to McCoy, he felt intimidated by Barrows and felt strongly enough that he did not go to the board of directors meeting because he was scared for his job.

Crystal Davis testified that she is a civilian employee in the Administrative Services department of the Fort Smith Police Department who works on accreditation. According to Davis, Barrows had vented out of frustration and anger regarding the way Chief Lindsey was handling the department and that Barrows expressed the belief that he could run it better.

Major Dean Pitts testified that he was asked to review Captain Haney's investigative file to determine whether the allegations against Barrows should proceed to a predetermination hearing. After reviewing all the materials, Major Pitts believed that there were serious violations that merited disciplinary action. According to Major Pitts, he knew that Chief Lindsey had solicited Barrows 'sand the other majors' input on their confidence about his job abilities, but that Barrows stated before the meeting that he intended to "have it out" with the chief. According to Pitts, the investigation also revealed that on Barrows's computer was a written communication between Barrows and a member of the City's board of directors that contained critical and derogatory comments regarding Chief Lindsey. Pitts stated that based on the number of rule violations, he believed that there was a pattern of behavior on Barrows's part that had a direct impact on the department and warranted Barrows's termination.

Barrows testified that he had issues with Chief Lindsey not seeking input from higher-level management before implementing changes or starting new programs. With regard to the Sentinel program, Barrows stated that he expressed some concerns about liability issues and issues concerning safety, staffing, and expense. According to Barrows, he had a meeting with Chief Lindsey and told him that he was frustrated and that it was hard for him to do his job when he was not made aware of things that involved his normal job duties. Barrows told Lindsey that he was going to speak with Administrator Reed about his concerns. Barrows denied ever denigrating the chief in front of Crystal Davis, but admitted to voicing his frustrations that the chief was not keeping him informed and stating that it was difficult to work and manage people under those circumstances. On cross-examination, Barrows also admitted that he probably said something to Davis about the department not being run as well as it could be.

Likewise, Barrows denied making any comments regarding the chief's compe-

tence to Corporal Bates. Barrows later admitted, however, that Bates could have perceived from what he said that he felt the chief did not know how to run the department. Barrows also stated that he only told Sergeant Copeland to come to him about media releases because the chief was new to Arkansas and not familiar with the state's FOIA statute. Barrows then admitted, however, to making some comment to Copeland about the chain of command breaking down. Barrows also admitted making comments to Captain Hallum about being frustrated with Chief Lindsey but denied ever stating that he believed the chief needed to resign. Barrows stated that he was never insubordinate to Chief Lindsey and that he believed he could work with Lindsey but "that's a two-way street."

In addition to the testimony adduced at the hearing, Barrows's statement taken by Captain Haney during the course of the investigation was also introduced. In that statement, Barrows admitted that he had discussed competency issues with regard to Chief Lindsey with "most everyone in the Administrative Services division at least privately." Moreover, Barrows admitted to discussing competency outside the department as well. Barrows stated that he told Chief Lindsey that he did not have confidence in him and that on several occasions he stated he could not work for Chief Lindsey.

After reviewing the record adduced at the civil-service hearing, the circuit court concluded that Barrows engaged in a pattern of denigration and criticism of Chief Lindsey that resulted in a violation of the following police department rules:

Rule 301.02 Failure to observe and adhere to the Rules and Regulations, Policies and directives of the Department.

Rule 301.09 Disrespect towards any supervisory officer, any civilian supervisor or subordinate.

Rule 302 Officers shall not engage in any conduct which constitutes conduct unbecoming an officer or neglect of duty.

Rule 303 Officers shall not engage in any personal act or conduct, which, if brought to the attention of the public, could result in justified criticism of that officer or the Department.

Rule 305 Officers shall not publicly criticize or ridicule the Department, its policies or other employees by speaking, writing or expressing in any manner which:

305.4 Tends to impair the operation of the Department by interfering with its efficiency, with the ability of supervisors to maintain discipline or by a reckless disregard for the truth.

In addition to the aforementioned rule violations, the circuit court also determined that Barrows violated the following policy:

Policy 1100.06 II.A. It is the policy of the Fort Smith Police Department to grant all members at every level within this organization the authority necessary for effective execution of their responsibilities. As such, each employee will be held accountable for the proper use of that authority.

The court also found Barrows violated rules and policies during his discussion with Detective McCoy regarding McCoy's planned presentation to the city board. Finally, the court found that Barrows violated the department's rules and policies with regard to the use of department time, resources, and manpower to his personal benefit. The court reasoned that these multiple violations, particularly the ones involving insubordination and undermining Chief Lindsey, warranted termination.

The City subsequently moved for summary judgment on the whistle-blower claim, asserting that there were no genuine issues of material fact remaining since the circuit court had found Barrows committed multiple violations of the department's rules and policies and, as a result, the City had an affirmative defense to the whistle-blower claim. Barrows argued to the circuit court, as he does now to this court, that summary judgment was inappropriate because there were material issues of fact regarding whether he had been terminated in retaliation for raising complaints about Chief Lindsey, and that he was entitled to have a jury make such a determination because a jury is not bound by the findings of the circuit court.

■ There is simply no merit to Barrows's contentions within his first two points on appeal. The circuit court reasoned that the determinative issue was whether the City had established an affirmative defense to the whistle-blower claim. Because the circuit court had previously ruled that Barrows violated multiple rules and policies, it was clear that his termination was the result of that misconduct and not related to any communication between Barrows and Administrator Reed. That previous ruling did, in fact, establish the City's affirmative defense to the whistle-blower claim.

There is simply no merit to Barrows's contention that the circuit court's grant of summary judgment denied him his right to a jury trial. This court addressed a similar argument in *Anglin v. Johnson Regional Medical Center*, 375 Ark. 10, 289 S.W.3d 28 (2008), where the appellant argued that the circuit court's grant of summary judgment violated his constitutional right to have questions of fact heard by a jury. This court acknowledged the right to a jury trial under article 2, section 7 of the Arkansas Constitution but rejected the appellant's argument, explaining that

> [t]he right to a jury trial under this provision is a fundamental right. This right extends to all cases that were triable at common law. That is, the constitutional right to trial by jury extends only to the trial of issues of fact in civil and criminal causes. Thus, where there is no factual dispute, there is no constitutional right to a trial by jury.

*Id.* at 20–21, 289 S.W.3d at 35. This court further stated that while there may have been fact issues involved, they were not matters of disputed fact, only differing legal interpretations of undisputed facts. This court concluded that in such a case, summary judgment was properly granted where reasonable persons would not reach different conclusions based upon those undisputed facts.

Just as in *Anglin,* there were no undisputed facts in this case that warranted proceeding to a jury trial. The circuit court determined as a matter of law that the City had an affirmative defense to Barrows's whistle-blower claim in that his termination was the result of his violating departmental rules and policies. As the circuit court reasoned, Barrows should not be allowed to force the City to prove that misconduct yet again.

Accordingly, we reverse and dismiss Barrows's civil-service appeal and affirm the grant of summary judgment on his whistle-blower claim.